**In re Earl H. DUPLECHAIN and Elwyn M. Duplechain, Confirmed Debtors.**

**Earl H. DUPLECHAIN and Elwyn M. Duplechain, Plaintiffs,**

**v.**

**GUARANTY BANK OF MAMOU, Defendant.**

**Bankruptcy No. 87–50400–BKC–012. Adv. No. 89AV–50026.**

United States Bankruptcy Court, W.D. Louisiana, Lafayette–Opelousas Division.

Feb. 21, 1990.

Kent Aguillard, for debtors.

Robert Naquin, Chapter 12 trustee.

Raymond Lejeune, Mamou, La., for Bank.

## MEMORANDUM OPINION AND ORDER

W. DONALD BOE, Jr., Bankruptcy Judge.

On May 8, 1989, the Duplechains, confirmed Chapter 12 Debtors, filed a complaint to determine the validity of the security interest of Guaranty Bank of Mamou (the Bank) in farm equipment. Their Chapter 12 plan was confirmed on October 22, 1987. The equipment involved in the complaint includes two White tractors and a Massey–Ferguson combine sold in De-

cember, 1988 to pay part of the cost of replacement equipment.

The Debtors' confirmed plan fails to mention any security interest in favor of the Bank on any movables. Instead, the plan provides for payments on what is referred to as "first mortgage" of Farmers Home Administration (FmHA) on farm equipment. The plan recognizes the Bank's first mortgage on various parcels of real estate, but it fails to deal with the first mortgage the Bank also had on farm equipment. A collateral chattel mortgage and note in favor of the Bank, and covering the collateral sold in December 1988, were executed on December 20, 1985 and recorded on December 26, 1985. FmHA's collateral mortgage was executed on May 5, 1986, and recorded on May 7, 1986. At that time, FmHA's security interest in equipment was clearly junior to that of the Bank, and it is stipulated by the parties that the Bank had a first mortgage when the Debtors filed their Chapter 11 petition on March 2, 1987. The issues before the Court are whether the Bank currently has a valid first mortgage against the equipment, and if so, the effect of the confirmed plan which treats FmHA as the first mortgage holder on equipment.[1]

There is a threshold dispute regarding whether the Bank obtained its mortgage in good faith. Mr. Duplechain testified that in mortgaging the movables he believed he was offering collateral as security for a loan by the Bank to be guaranteed by FmHA. Mr. Henry Crooks, FmHA County Supervisor, testified that his agency declined to provide a loan guaranty. Mr. Duplechain believes that the Bank should have "cancelled" its mortgage on the equipment after FmHA refused a loan guaranty. The Court, however, accepts the testimony of Mr. Ted Smith, Bank Vice President, that the collateral chattel mortgage of December 1985 was intended by the Debtors and the Bank to provide additional collateral to secure an extension of past-due indebtedness even though FmHA would not provide a guaranty. This testi-

---

1. The parties have agreed on the record that this Court in reaching a decision can take judicial notice of the contents of bankruptcy case file, and the Court has considered that file at length.

mony is supported by the documents admitted into evidence and attached to the Bank's proof of claim. The Court holds that there is insufficient evidence in this case to hold that the mortgage is invalid for any reason such as fraud or lack of consideration. It is now left for the Court to determine the effect of not mentioning the Bank's senior mortgage on movables in the confirmed plan of reorganization and the treatment therein of FmHA's junior mortgage as a first mortgage.

At trial, Mr. Duplechain suggested that his previous attorney reached some sort of agreement in negotiations preceding plan confirmation which resulted in FmHA, rather than the Bank, being treated as first mortgage holder on movable property. The Chapter 12 trustee testified he recalled that there were negotiations between the parties. He believed FmHA's superior ranking may have resulted from these negotiations. The Bank did not really have an explanation of why FmHA was treated as first mortgage holder. The Bank's Vice President essentially testified that the Bank lacked familiarity with the newly enacted Chapter 12, which is very understandable, and believed it was bound by whatever the Bankruptcy Court decided—an odd position since the Bank was not a passive or supine observer in this case. The Bank was an active participant, represented by attorneys. The Bank on April 6, 1987, filed a proof of claim showing a security interest in both real estate and movables. It also filed a motion for dismissal of the case. It additionally filed a motion to lift the automatic stay to allow foreclosure of all property mortgaged to it. Subsequently, the Bank filed objections to the Chapter 12 plan (though none dealt with movable property), had detailed appraisals prepared for hearings to value its farmland collateral, and participated in two plan confirmation hearings. The Bank was the major creditor-party in the case.

Under articles 4 and 6 of the confirmed plan, the Debtors surrendered certain immovable property including the family home in exchange for specified credits against their indebtedness. The only plan provision that deals with property retained by the Debtors, Article 3, treats the Bank as secured by farmland, 104 acres in article 3(a) and 357 acres in article 3(b). Article 3 concludes in part, "All mortgage creditors shall retain their respective mortgages or liens until all payments made and scheduled hereinabove have been paid in full."

This Court is unable to conclude that Debtors by a preponderance of the evidence have demonstrated that the Bank and the Debtors, through their attorneys, managed to strike some out-of-court bargain in which the Bank agreed to forego any lien against movables. Mr. Duplechain's testimony fails to explain how or when he or anyone else discovered, pre-confirmation, that the Bank had a first position with respect to movables. Neither the FmHA County Supervisor nor the Chapter 12 trustee, according to their testimony, had any knowledge of this pre-confirmation. Mr. Duplechain's testimony that he believed his previous attorney had resolved "any problem" is not corroborated by testimony from that attorney that there was any problem or that it had been resolved through negotiations. While the omission in the confirmed plan of any reference to the Bank's security interest in movables might be attributed to some off-the-record agreement or settlement of the parties in light of the Bank's thorough going participation in this bankruptcy case, the evidence shows that none of the parties ever managed to recognize, in relation to plan confirmation issues, that the Bank had a first mortgage on movables. The Debtors' own schedules, statement of intentions, and statement of affairs filed in the bankruptcy case reflect no recognition by the Debtors that the Bank had collateral other than farmland; FmHA was treated by the Debtors as the only mortgagee of farm equipment. Had the Bank, in relation to plan confirmation issues, ever *carefully* looked at its own proof of claim, or at the list of farm equipment set forth in Exhibit A to its motion of April 6, 1987 to lift the automatic stay, it would have recognized that it had a security interest in movables. Does this mean that the Bank should win? Not necessarily.

■ We are here met on a field of warring legal principles, with the Debtors contending that plan confirmation is *res judicata,* and with the Bank contending that a confirmed plan will not invalidate or extinguish valid liens. The precedents marshaled by counsel on each side of this line of battle give no clear advantage to either side, though other uncited precedents give the Bank the advantage.

The Bank cites language in *Matter of Riley,* 88 B.R. 906 (Bankr.W.D.Wis.1987) for the proposition that a confirmed plan will not invalidate or extinguish otherwise valid liens. *Riley* quotes from *In re Spohn,* 61 B.R. 264 (Bankr.W.D.Wis.1986). Both decisions involved Chapter 13 plans confirmed pending determination of claims. The present Chapter 12 case could be viewed as one in which there was no need for post-confirmation determination of claims. The Debtors had only four creditors including the Internal Revenue Service. The amounts of both secured and unsecured claims for each creditor were set forth in the confirmed plan.

The Bank also cites *Matter of Willey,* 24 B.R. 369 (Bankr.E.D.Mich.1982) involving failure of a secured creditor to file a proof of claim and subsequent confirmation of a Chapter 13 plan treating it as an unsecured creditor. The court held that the creditor had a right to payment as an unsecured creditor and that the creditor's lien would survive after the plan had ended unless satisfied 100 percent by unsecured payments and distributions under the plan. The lesson of *Willey* appears to be that is that while plan confirmation is *res judicata* and binding on all creditors, proof of claim procedures do not affect substantive *in rem* rights of secured creditors. *See* 24 B.R. at 371 and 375. The effect of proof of claim procedures on *in rem* rights is not part of the fact pattern in present Chapter 12 case. Arguably, the issue instead is whether the plan as confirmed after extensive participation by the creditor cuts off *in rem* rights.

Finally, the Bank relies on *In re Stone,* 91 B.R. 423 (Bankr.N.D.Ohio 1988), which, over the objection of a secured creditor, allowed post-confirmation reclassification of a secured claim as unsecured after sale of the underlying collateral. *Stone* assists the Bank only to show there is some tension between the *res judicata* rules contained in 11 U.S.C. Sec. 1227 and the provisions for post-confirmation plan modification appearing in 11 U.S.C. Sec. 1229.[2] Each set of requirements must be given a reasonable rather than absolutist interpretation to accommodate the tension between them.

This Court is mindful that the Court of Appeals in *In re Simmons,* 765 F.2d 547 (5th Cir.1985) (not cited by the parties) has upheld noncancellation of a statutory lien treated as unsecured in a confirmed Chapter 13 plan where the creditor failed to object to unsecured status in plan confirmation proceedings. This Court believes, however, that the logic of *Simmons* does not apply with full force to the present case where there were only four creditors, where the amounts of secured and unsecured claims were determined during the plan confirmation process, and where the Bank, which was treated as partly unsecured, actively participated in the Chapter 12 case.

This Bankruptcy Court does find *In re Tarnow,* 749 F.2d 464 (7th Cir.1984) (not cited by the parties) instructive and relevant to the facts of the instant case. Judge Posner in *Tarnow* held that a Commodity Credit Corporation lien in a Chapter 11 case was not invalidated by CCC's failure to timely file a proof of claim. His decision reversed that of a bankruptcy judge who had not only disallowed the secured claim because it was late, but had also declared the lien extinguished. Judge Posner found extinguishment too "drastic" a sanction for a late filed claim; the claim should simply have been disallowed. *Id.* at 466. (The Bankruptcy Court in the instant

---

**2.** No specific plan modification has been proposed by the Bank. If any had been proposed, it might seek to reverse the lien positions of the Bank and FmHA with respect to movables.

Neither this nor any similar remedy could be afforded in this proceeding in which FmHA is not a party.

case also believes that lien extinguishment is too drastic a remedy.) In partial support of his decision in *Tarnow*, Judge Posner cited the line of cases beginning with *Long v. Bullard*, 117 U.S. 617, 6 S.Ct. 917, 29 L.Ed. 1004 (1886) which roughly stand for the proposition that a lien creditor can ignore the bankruptcy proceeding entirely and look to its lien for satisfaction of the underlying debt (with valid or unchallenged liens surviving the bankruptcy process).[3]

The precedents fielded by the Debtors, like those deployed by the Bank, suffer from infirmities. The Debtors on brief cite *In re Flick*, 5 C.B.C.2d 494, 502, 14 B.R. 912 (Bankr.E.D.Pa.1981) for the proposition that the order confirming a plan is *res judicata* as to all justiciable issues decided or which could have been decided at the confirmation hearing. But *Flick* did not involve extinguishment of any lien, defined by Bankruptcy Code Sec. 101(33) as "a charge against or interest in property". Instead, *Flick* involved the effect of plan confirmation on "claims", generally defined by Bankruptcy Code Sec. 101(4) as "a right to payment". Other cases cited by the Debtors also fail to deal with the effect of plan confirmation on the very existence of liens. *In re Nash*, 765 F.2d 1410, 1412–1413 (9th Cir.1985); *Matter of Grogg Farms, Inc.*, 91 B.R. 482 (Bankr.N.D.Ind. 1988); *In re Moseley*, 74 B.R. 791 (Bankr.C. D.Cal.1987); *In re Herron*, 60 B.R. 82 (Bankr.W.D.La.1986); *In re Guilbeau*, 74 B.R. 13 (Bankr.W.D.La.1987) (confirmed plan results in adequate protection and thus prevents foreclosure of a lien).

*In re Nicholson*, 70 B.R. 398 (Bankr.D. Col.1987), cited by the Debtors, may suggest that Bankruptcy Code Secs. 1227(b) and (c) destroy all lien rights not expressly preserved in the confirmed plan. The same language (with an exception not here relevant) appears in Secs. 1327(b) and (c), and is interpreted differently by our Court of Appeals. The property that under Sec. 1327(b) vests in the debtor upon plan confirmation is only property "of the estate", not all property over which the debtor may have control. And the vesting of property under Sec. 1327(c) free and clear of any interest, which is not defined by the Code, does not mean a vesting free and clear of liens. *See In re Simmons*, 765 F.2d at 555.

 This Court, based upon *Simmons*, rejects the proposition that lien rights not expressly preserved in a plan are destroyed and, based upon a well-established principle of interpretation, believes that ambiguities in the plan should be construed against the Debtors. Both the original plan and the subsequently confirmed plan, which has similar provisions, were prepared by the Debtors.

> "... [T]he debtor as draftsman of the plan has to pay the price if there is any ambiguity about the meaning of the terms of the plan. This comports with the long-standing rule that ambiguous terms of a document are to be interpreted against the party that drafted them."

*In re Fawcett*, 758 F.2d 588, 591 (11th Cir.1985). In the present case, the confirmed plan contains significant ambiguities, starting with the failure to deal with the Bank's security interest in farm equipment. No mention at all is made of this security interest in Article 3 which deals with all of the property that debtors would retain—rather than surrender—under the terms of the plan. Article 3 also goes on to provide that "All mortgage creditors shall retain their respective mortgages or liens until all payments ... have been paid in full...." This language is susceptible of at least three interpretations, making the plan ambiguous. "Respective" mortgages or liens could mean the mortgages or liens of the Bank and FmHA, respectively. Or it could mean mortgages or liens only on farmland in the case of the Bank and only on farm equipment in the case of FmHA. Or "respective" mortgages or liens could mean whatever mortgages or liens that the Bank and FmHA happened to have. While the Debtors seek to rely on language in Article 8 which may be read to exclude any

---

**3.** This does not necessarily mean that bankruptcy will not affect a lien. *See Matter of Lindsey*, 823 F.2d 189, 190 (7th Cir.1987), where Judge Posner noted that the "old saw" that liens pass through bankruptcy unaffected "is no better than a half truth".

Bank mortgage or movables, another interpretation is also possible—that the intent was simply to preserve mortgages and liens on all the Debtors' property that would be retained under the terms of the plan; with title to other property immediately to revest in the Debtors.[4]

This Bankruptcy Court believes that the law, including the rehabilitative intent of Chapter 12, does not justify a judgment in favor of the Debtors in this adversary proceeding which would cancel the mortgage to the extent that it encumbers equipment and decree that the Bank has no security interest in that equipment.

To apply the doctrine of *res judicata* in this instance to extinguish the mortgage lien would be inappropriate under the law and the facts of this case. *Res judicata* is a doctrine designed to prevent relitigation of that which has already been litigated or which could have been litigated. The issue of the Bank's mortgage on movables was not litigated. Nor could it, in any real sense, have been litigated. No one, or so it would seem, was aware of this issue.

The confusion apparently began due to fault or omission of the Debtors. The Debtors in no schedule or statement of affairs ever noted that the Bank had a mortgage on movables. To the contrary, the Debtors affirmatively stated that FmHA had a mortgage on movables. This may have led the Bank right down the garden path of focusing exclusively on its farmland collateral. While the Bank based upon its security instruments should have known better, so should the Debtors whose interest lay only in several mortgages.

Under the case law cited above, there is no reason to believe that the doctrine of *res judicata* should be used to extinguish the mortgage lien on movables. The Debtors want the lien declared extinguished to allow them to mortgage further this collateral which was fully liened up prior to plan confirmation. There is no probative evidence that anyone, at time of plan confirmation, ever intended this unjust enrichment. The doctrine of *res judicata* does not result in lien extinguishment in this case. *See, e.g., Simmons* and *Fawcett, supra.* The payments the Bank receives under the confirmed plan are *res judicata,* provide adequate protection to it as a matter of law, and prevent any foreclosure by the Bank provided the Debtors comply with the plan's terms. *See In re Guilbeau, supra.* But the Bank's *in rem* rights to movable collateral are not extinguished.

The Bank's answer to the complaint has requested an accounting, reimbursement for all funds the Debtors derived from the sale of mortgaged equipment, and application of this funds to the debt owed the bank. The evidence in this adversary indicates that the funds have been applied as a downpayment on new equipment, and the Court has not been advised of the type of accounting desired, or whether and on what basis, if any, it would have jurisdiction to require an accounting, or to issue an order or judgment requiring payment by the Debtors to the Bank. Accordingly, the Court will grant no relief to the Bank other than to declare that confirmation of the Chapter 12 plan did not affect or modify the Bank's mortgage lien on movables.

---

4. This language reads:
 "Except for the secured creditor claims mentioned in Article 3(a), (b), and (c) whose mortgages shall remain on the asset securing the claim until all plan payments to the secured creditor including the payments to be made by the debtors beyond the term of the plan which have been made, title to the debtors' property shall revest in the debtors on confir-

mation of the plan (or upon dismissal of the case after confirmation.)"

This language from the plan filed August 12, 1989, which was confirmed on October 22, 1987, was carried over unchanged from the original plan filed June 1, 1987. At that early date, based upon review of the case file, the Court concludes that no serious negotiations between the parties would have been initiated.